**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 23-60203-CR-BB (COHN)**

**UNITED STATES OF AMERICA**

**vs.**

**STEPHANIE DIANE SMITH,**

**Defendant.**

_____/

**UNITED STATES' SENTENCING MEMORANDUM**

**I.**    **Introduction**

The United States of America, by and through its undersigned counsel, hereby submits this sentencing memorandum as to Defendant Stephanie Diane Smith ("Defendant").   Defendant is presently scheduled to be sentenced on May 29, 2024, for convictions of two counts of wire fraud resulting from the jury's guilty verdict in the trial of this cause.   Under the Sentencing Guidelines ("Guidelines"), the advisory sentencing range is 4-10 months' imprisonment based upon a total offense level of 9 and a criminal history category of I, as computed by the U.S. Probation Office ("Probation") in the Presentence Investigation Report, last revised May 21, 2024 and filed at docket entry ("DE") 93 (the "PSR").   As of the filing this memorandum, neither side has reported objections to the PSR.

For the reasons addressed herein, the United States respectfully recommends a sentence of 10 months' imprisonment, to be followed by three years of supervised release, and restitution in the amount of $31,108.   The United States also seeks a forfeiture money judgment in the amount of $31,108 (DE 94).   A $200 special assessment is mandatory.   This sentence is sufficient, but not greater than necessary, to achieve the goals of sentencing set forth in 18 U.S.C § 3553(a).

II.     **Summary of the Offense**

The United States adopts and incorporates by reference all facts set forth in the Offense Conduct section of the PSR (¶¶6-49), to which Defendant has not filed any objection, along with the facts proved at trial, many of which the government set forth in its response to Defendant's motion for a new trial (DE 90 at 2-9).

To summarize, from March 2021 through November 2021, while employed as a Deputy Sheriff with the Broward Sheriff's Office (BSO), Defendant knowingly, and with the intent to defraud, participated in a scheme in which she received two loans from the Paycheck Protection Program ("PPP") based upon materially false gross income information for two sole proprietorship businesses, Children 1st Basketball Training ("Children 1st") and Agape Smith Vending ("Agape").   The fruits of this scheme resulted in Defendant's unlawful receipt of $31,108.

The lies at the center of the scheme, upon which Defendant's fraudulent PPP loans were based, were that Children 1st and Agape each had "$100,000" and "$49,326" of gross income in 2019, respectively.   The "$100,000" and "$49,326" gross income lies were made to the SBA and its lenders on PPP loan applications that Defendant signed electronically via DocuSign, and on the IRS Form 1040 Schedule C tax documents submitted therewith.   For comparison, Defendant reported to the IRS on her individual tax return for the year 2019 that Children 1st and Agape had **$0.00** and **$1,452** of gross income in 2019, respectively.   Defendant's bank records further demonstrated that Defendant's accounts did not have deposits or inflows consistent with or otherwise substantiating the income represented in the respective PPP applications.   Additionally, Defendant never sought approval for off-duty employment from her employer (BSO), which

BSO's off-duty policy would have required if Defendant had earned the off-duty income represented in the respective PPP loan applications for Children 1st and Agape.

Defendant was directly and intentionally involved with her PPP loans every step of the way—throughout the processes of applying, funding, and forgiveness. Defendant's direct participation included phone calls, emails, and online activity related to her PPP loans. For example, from May through November 2021 (the duration of the charged scheme), Defendant's cell phone had approximately 40 phone calls with the cell phone of Dora Smith, the person whom Defendant paid $4,000 for assisting with the preparation of Defendant's PPP loan applications. Defendant and Dora Smith had never spoken before Defendant's PPP loan process commenced in March 2021, and never spoke again after it concluded with the forgiveness of the Agape PPP loan in November 2021. Many of the calls between Defendant and Dora Smith occurred on critical dates in the loan process, including: 5 phone calls on the date that, according to the PDF file properties, the "2019" Schedule C for Agape was created (March 26, 2021); 7 phone calls on the date that Defendant signed via DocuSign the Children 1st PPP loan application (March 29, 2021); 9 phone calls on the date that the Agape PPP loan application was submitted (April 15, 2021); 1 phone call on the date that the forgiveness application for Children 1st was signed via DocuSign (July 19, 2021); and 2 phone calls on the date that the forgiveness application for Agape was signed via DocuSign (October 18, 2021).

Defendant signed via DocuSign the PPP loan documents for Children 1st (on March 29) and Agape (on April 29) using the internet service provided by AT&T at her residence (IP address 162.227.127.56). After signing the loan document for Children 1st on March 29, Defendant received via email a PDF of the entire package—including the PPP loan application (SBA Form

2483-C) that falsely represented that Children 1st had gross income of $100,000 in 2019. Defendant saved that PDF attachment, created a new email, and sent the PDF to Dora Smith.   In total, Defendant sent or received at least 23 emails related to her PPP loans.   Defendant received emails from Cross River (the lender for the Children 1st PPP loan), Blue Acorn (the loan processor for the Agape PPP Loan), and the SBA.

Defendant's participation in the scheme also included online activity.   Using her iPhone, Defendant logged into her online PPP loan account for Agape on the website/portal for Blue Acorn (the loan processor for the Prestamos, the lender of the Agape PPP loan) at least 7 times from April 15 to May 17, 2021.   The login dates included April 15 (the date the Agape PPP loan application was submitted), April 29 (the date Defendant signed the Agape PPP loan documents via DocuSign), and May 11 (the date Defendant received the Agape PPP loan proceeds).   During Defendant's login on April 15 (the date the Agape PPP loan application was submitted), Defendant was simultaneously on a phone call with Dora Smith that lasted approximately 5 minutes. Defendant's April 29 login occurred two minutes after Defendant signed the Agape PPP loan documents via DocuSign.

Upon receipt of the PPP loans in her bank account, Defendant wrote checks to herself and her wife with the word "payroll" in the memo.   With respect to the $28,833 Defendant received from the Children 1st PPP loan, Defendant wrote four checks (two checks to herself and two checks to her wife) totaling $14,500.   With respect to the $10,275 Defendant received from the Agape PPP loan, Defendant wrote six checks (three checks to herself and three checks to her wife) totaling $7,700.   Defendant had never written such payroll checks before receipt the PPP loans,

and did not write such checks after the loans were forgiven.   Defendant also paid Dora Smith $4,000 ($2,000 for each PPP loan) using the fraudulently obtained PPP loan proceeds.

In August 2023, Defendant participated in a consensual interview with the FBI about the PPP loan applications for Children 1st and Agape.   During that interview, which occurred at a time and location of Defendant's choosing, the FBI showed Defendant her loan documents for both PPP loans and asked Defendant to confirm whether the information was true.   Although Defendant knew that, in 2019, Children 1st and Agape did not earn $100,000 and $49,326, respectively, Defendant nevertheless told the FBI that all the information in the PPP loan applications and supporting documents was true.   Furthermore, Defendant initialed the documents in 39 places to indicate in writing that the information was true.   Defendant never told the FBI that the gross income information for either business was false, or that someone else (*e.g.*, Dora Smith) had completed the PPP loan applications with false information without Defendant's knowledge.

### III.   <u>Procedural History</u>

This prosecution was initiated by a criminal complaint filed in the Southern District of Florida on October 11, 2023 (DE 3).   On October 19, 2023, a grand jury sitting in this District retuned the indictment charging Defendant with two counts of wire fraud.   Defendant pleaded not guilty and proceeded to trial, which commenced on February 26, 2024.   On March 5, 2024, the jury returned a guilty verdict on both counts.   The Court adjudicated Defendant guilty, deferred sentencing to May 29, 2024, and ordered a presentence investigation.   The draft PSR was first disclosed on April 24, 2024 (DE 91) and the revised PSR with addendum was disclosed on May 21, 2024 (DE 93).   Neither party has filed objections.

Additionally, on March 19, 2024, Defendant filed a motion for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure (DE 84), to which the government responded in opposition on April 19, 2024 (DE 90).   The Court denied Defendant's motion for a new trial in a written Order entered on May 2, 2024 (DE 92).

**IV.**   **Sentencing Guidelines Calculation**

As set forth in the PSR (¶¶ 53-61), the offense level is calculated as follows:

| | |
|---|---|
| Base Offense Level (§ 2B1.1(a)(1)) | 7 |
| Loss greater than $15,000 but not more than $40,000 (§ 2B1.1(b)(1)(C)) | 4 |
| Zero-Point Offender §§ 4C1.1(a)(1)-(10). | -2 |
| **Total Offense Level** | **9** |

The United States submits that this is the correct computation of the offense level. Defendant has zero criminal history points, which establishes a criminal history category of I (PSR ¶64).   Therefore, the guideline imprisonment range is four to ten months (PSR ¶113).

**V.**   **Consideration of Sentencing Factors Under 18 U.S.C. § 3553(a)**

Title 18, United States Code, Section 3553(a), enumerates several factors that the Court must consider in sentencing a defendant.    As addressed in turn below, the 3553(a) factors relevant to Defendant Stephanie Smith supports the sentence recommended by the United States.

**1.**   **Nature and Circumstances of the Offense.**

A jury found Defendant guilty of serious offenses – two counts of wire fraud in connection obtaining fraudulent loans from the PPP.   In 2020, as the COVID-19 pandemic spread across the country, Congress responded earnestly by passing the CARES Act to help small business owners and their employees whose livelihoods were jeopardized by the shuttering of business operations

and cash flow.   The PPP was designed as a lifeline to small businesses to keep their employees on the payroll by protecting their paychecks.   Funds for the PPP were limited, and the legitimate demand for relief money quickly exceeded the available supply.

In 2021, Congress authorized additional funding for the PPP since the pandemic was far from over.   Defendant, then a sworn law enforcement officer who remained employed by BSO throughout the pandemic and received her BSO salary uninterrupted, selfishly exploited this declared national emergency, and the government's response to it, by lying to get two separate PPP loans, neither of which she was entitled to.   The circumstances of this offense involved Defendant signing two separate PPP loan applications in which she falsely certified that all information was true despite the obviously enormous overstatement of income for Children 1st and Agape.   Defendant also caused the submission of false tax documents to support those lies. More specifically, Defendant did not use her real 2019 tax documents for her PPP loan applications because she knew Children 1st had reported zero dollars of gross income (and a loss of -$31,911) and Agape had reported $1,452 in gross income (and a loss of -$32,239).   Instead, as Dora Smith testified, Defendant provided false information to Dora Smith to create and submit false Schedule C forms, and then paid Dora Smith $2,000 for doing so for each PPP loan application ($4,000 total).

Defendant's theory of defense at trial claimed ignorance and shifted all blame to Dora Smith.   But Defendant's dozens of calls and emails with Dora Smith, as well as Defendant's own online activity in her PPP loan account, proved that Defendant acted deliberately throughout the process and knew that both PPP loans were based on lies.   Defendant's knowledge and fraudulent intent was further buttressed by the fact that Defendant had applied in 2020 for other pandemic

relief from the SBA (an Economic Injury Disaster Loan), and was informed that Agape did not qualify for such EDIL because it had not substantiated an economic injury.

Once the fraudulent PPP loans were disbursed to Defendant's bank account, her direct role in the offense continued by writing sham "payroll" checks to herself and her wife.   As Defendant testified, she knew that the PPP funds had to be spent on "payroll" (DE 90-1, Tr. at 56-57) and Defendant only wrote these purported "payroll" checks to herself and her wife so Defendant could apply for loan forgiveness (DE 90-1, Tr. at 180-82).   Defendant's forgiveness applications for Children 1st and Agape, which required Defendant to certify again that all the information supplied was true (and that she had been entitled to the loans in the first place), contained additional lies that resulted in forgives of the PPP loans Defendant was never entitled to receive.

As a police officer with a bachelor's degree in sociology, Defendant certainly knew better than to make false statements to get pandemic relief assistance.   Yet the fact that Defendant knew she had not even sought approval from BSO to have any off-duty employment, and that she further knew she had reported virtually no income to the IRS for Children 1st and Agape, makes the circumstances of Defendant applying for PPP loans for these businesses (while employed by BSO) even more egregious.

Defendant testified at trial that she was not desperate for $20,000 (DE 90-1, Tr. at 39). What that shows, in combination with the other admitted evidence, was that this was a crime motivated by greed.   Defendant was driven by what she saw as an easy opportunity to steal from a trust-based program that had little oversight, coupled with a mindset that she would not get caught.   That mindset was on full display during Defendant's interview with the FBI interview almost two years after the scheme had ended.   When presented with the opportunity to tell the

FBI about the patently false information in the PPP loan applications, Defendant continued to lie by affirming that the information regarding Children 1st and Agape was true when she well knew it was not.

For these reasons, a sentence of 10 months' imprisonment is sufficient and not greater necessary to reflect the seriousness of the offenses of conviction and the circumstances described herein.

### 2.    History and Characteristics of the Defendant.

The PSR reflects that Defendant does not have any criminal history points from any convictions and has no prior criminal conduct, pending charges, or other arrests.   Defendant is correctly in criminal history category I, and the Guidelines computation correctly includes a two-level reduction in the offense level for a zero-point offender.   Defendant's lack of criminal history is therefore factored into the Guideline sentencing range of 4-10 months.   That said, Defendant's testimony at trial revealed characteristics of dishonesty and deceitfulness that support a sentence at the top of these Guidelines as recommended by the United States.

First, Defendant testified on direct examination that she had no reason to believe that there was anything not accurate, true, or correct about her tax returns filed with the IRS (DE 90-1, Tr. at 24).   However, on cross examination, Defendant could not explain significant business expenses for Children 1st and Agape reported on her tax returns.   Specifically, from 2018 through 2020, Defendant claimed, in total, nearly $200,000 in expenses for Children 1st and Agape (the equivalent of 50% of her aggregate BSO salary for those years), and she could not identify what those expenses were.   For example, Defendant's 2019 tax return claimed that Children 1st had "$31,911" in expenses and $0.00 of gross income (GX 402).   Defendant testified this was true "to

the best of my knowledge" (DE 90-1, Tr. at 99), but Defendant could not explain the following expenses, among others: "$9,414" of "other business property" rented or leased (Schedule C, line 20b; DE 90-1, Tr. at 94); "$2,002" of "repairs in maintenance" (Schedule C, line 21; DE 90-1, Tr. at 95); and "$3,578" in "supplies" (Schedule C, line 22; at DE 90-1, Tr. at 95-96). Defendant testified that some of her expenses were basketballs and uniforms she purchased for children she was training, but could not tell the jury how much she spent on basketballs or uniforms in 2019, or even how much those items cost (DE 90-1, Tr. at 96-97). Similarly, Defendant's 2020 tax return claimed that Agape had $45,019 in "contract labor" expenses and $0.00 of gross income (GX 403). When asked about this, Defendant testified, "I don't know what 'contract labor' is, sir." (DE 90-1, Tr. at 123). Nevertheless, Defendant testified that "to the best of my knowledge" this information was correct. DE 90-1, Tr. at 123. The veracity of these expenses on Defendant's tax returns, which Defendant signed, raises questions about Defendant's character for truthfulness given the nature of these businesses (i.e., basketball training for children and vending machines in beauty salons) and the size of the expenses relative to all other sources of her income (50% of her aggregate BSO wages from 2018 through 2020).

Defendant's testimony about her FBI interview also showed a dishonest character. Defendant admitted that she put her initials on the documents during the interview (DE 90-1, Tr. at 189-92; 195), but she testified that she could not remember why she initialed the documents and what questions the FBI had asked her about her PPP loans. Additionally, Defendant admitted that she did not tell the FBI that the gross income information for Children 1st and Agape in her PPP loan applications was false, but she testified this was because "there was no need to" (DE 90-1, Tr. at 195), she "didn't pay attention to the information" (DE 90-1, Tr. at 199), and she "looked

but didn't look" at the documents (DE 90-1, Tr. at 199).   None of these explanations were credible.

In sum, the portrait of dishonest character that emerged from Defendant's testimony at trial supports the sentence recommended by the United States.

### 3. Need for the Sentence to Reflect the Seriousness of the Offense, Promote Respect for the Law, Provide Just Punishment, and Afford Adequate Deterrence to Criminal Conduct.

As explained above, Defendant has committed serious offenses.   Wire fraud carries a maximum term of imprisonment of twenty years, and with two counts of conviction, Defendant's maximum exposure is forty years in prison.   The sentence recommended by the United States is needed to reflect the seriousness of this offense, and to promote respect for the law, and provide just punishment.   Although a sentence of 10 months' imprisonment is toward the bottom of the overall sentencing table of the Guidelines, and certainly modest in comparison to the maximum penalty under law, it will still send a message that stealing from government programs such as PPP has serious consequences.   In this respect, the sentence will also afford adequate deterrence to this criminal conduct, which is very much needed.

As to general deterrence, the Eleventh Circuit has explicitly stated that "general deterrence is an important factor in white-collar cases, where the motivation is greed."   *United States v. Hayes*, 762 F.3d 1300, 1308 (11th Cir. 2014); *see also United States v. Howard*, 28 F.4th 180, 209 (11th Cir. 2022) (noting that "[g]eneral deterrence is more apt, not less apt, in white collar crime cases.   The reason is that economic and fraud-based crimes are more rational, cool and calculated than sudden crimes of passion or opportunity, which makes them prime candidates for general deterrence.") (internal quotations and citations omitted).

As explained above, this case was motivated by Defendant's greed at a time when she was fully employed, and millions of other Americans were suffering from the economic impact of a global pandemic.   As the pandemic spread, so too did fraud related to the PPP and EIDL programs and other programs designed to provide critical economic assistance—especially in the Southern District of Florida.   The government's recommended sentence of imprisonment in this case is thus appropriate to provide both specific and general deterrence.   Such a sentence will send a clear message to Defendant and other offenders that there are serious consequences for defrauding government relief programs.   Leniency in this case would send the wrong message.

### 4.   Need to Avoid Unwarranted Sentence Disparities Among Defendants with Similar Records who have been found guilty of similar conduct.

In October 2023, seventeen Deputy Sheriffs of the Broward Sheriff's office were arrested on similar charges relating to fraudulently obtained PPP loans.   Since then, all but three of those defendants have accepted responsibly and pleaded guilty.   Defendant Stephanie Smith was the first former Deputy Sheriff charged in this operation to go to trial.[1]

A sentence of 10 months' imprisonment for Stephanie Smith would not create an unwarranted sentence disparity among the other former Deputy Sheriffs that have been sentenced thus far.   Although those defendants did not receive a sentence that included a term of imprisonment, those defendants had Guidelines ranges at or near zero months' imprisonment. Furthermore, those defendants stood before the court for sentencing having accepted responsibility for their conduct.   Defendant Stephanie Smith has not.   This Defendant has neither accepted responsibility, nor shown any remorse for her conduct.   Furthermore, Defendant's Guidelines are

---

[1] Defendant Carolyn Denise Wade proceeded to trial on May 13, 2024 (Case No. 23-60173-CR-KMW (Graham). The jury was unable to reach a unanimous verdict in that case.   Defendant Alexandra Acosta is schedule to proceed to trial in June 2024 (Case No. 23-60170-CR-Scola).

above of the range that includes zero months' imprisonment, and no variance is warranted.   Based on these distinguishing factors, as well as the other factors addressed herein, a sentence of 10 months' imprisonment in this case would not create an unwarranted disparity.

## VI.   <u>Restitution and Forfeiture</u>

Restitution is mandatory in this case pursuant to 18 U.S.C. § 3663A(a)(1).   As set forth in the PSR, restitution is owed to the SBA in the amount of $31,108 (PSR ¶ 125), which represents the amount of the unlawfully obtained PPP loans for Children 1st and Agape.   Defendant has not objected to this amount.

The United States is seeking forfeiture and filed a motion for entry a forfeiture money judgment on May 24, 2024 (DE 94).   For the reasons set forth therein, the Court should order a forfeiture money judgment in the amount of $31,108.

[*Remainder of Page Intentionally Blank*]

## VII.   <u>Conclusion</u>

For the forgoing reasons, the United States respectfully recommends that the Court sentence Defendant Stephanie Diane Smith to a term of imprisonment of 10 months, to be followed by three years of supervised release.   The United States also requests that the Court order restitution in the amount of $31,108, a forfeiture money judgment in the amount of $31,108, and a special assessment of $200.

<div style="margin-left: 40%;">

Respectfully submitted,

MARKENZY LAPOINTE
UNITED STATES ATTORNEY

By:   <u>*/s/ David A. Snider*              </u>
David A. Snider
Assistant United States Attorney
Court ID No. A5502260
500 E. Broward Blvd
Fort Lauderdale, FL   33394
Tel: (954) 660-5696
Fax: (954) 356-7336
Email: david.snider@usdoj.gov

</div>